(158 App. Div. 9.)

### BURTIS v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department.   July 8, 1913.)

1. RAILROADS (§ 275*)—INJURIES TO LICENSEE—DEGREE OF CARE REQUIRED.

    A railroad company is bound to conduct its operations so as not to injure a boy, employed by a cattle shipper to stand upon the gangway owned by the company and leading from the cattle chute.

    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 873–877; Dec. Dig. § 275.*]

2. RAILROADS (§ 273½*)—INJURIES TO TRESPASSERS—DEGREE OF CARE.

    A railroad company is liable for injuries received by a trespasser upon its property, only when they result from some wanton or intentional act of the company.

    [Ed. Note.—For other cases, see Railroads, Dec. Dig. § 273½.*]

3. RAILROADS (§ 297*)—INJURIES TO LICENSEES OR TRESPASSERS—SUFFICIENCY OF EVIDENCE.

    In an action by a boy for injuries received by him while standing on a cattle chute owned by the railroad company, evidence *held* to require a reversal of a verdict for plaintiff, on the ground that he was in the employ of a cattle shipper when injured, as against the weight of evidence.

    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 944–953; Dec. Dig. § 297.*]

Appeal from Trial Term, Jefferson County.

Action by Lloyd Burtis against the New York Central & Hudson River Railroad Company.   Judgment for plaintiff, and defendant appeals.   Reversed, and new trial granted.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

Purcell, Cullen & Purcell, of Watertown, for appellant.

La Rue & Slate, of Watertown (Thomas Burns, of Watertown, of counsel), for respondent.

MERRELL, J.   The plaintiff, a boy 10 years of age, received serious injuries by having his foot caught between a cattle car and the gangway used in loading cattle and stock upon defendant's cars for transportation at Antwerp, N'. Y.,. on August 24, 1907, which injuries necessitated the amputation of his foot.   The plaintiff claims that at the time of his injury he was employed by a cattle shipper to stand upon the gangplank leading from the cattle chute to the car, to watch some stock which had been loaded, and to prevent their escape from the car in which they had been placed through the open car door opposite the loading chute or gangway; plaintiff alleging that while so lawfully engaged the defendant's employés shunted some cars against that opposite which he was stationed, and that the gangplank was shoved and his foot crushed.   It is plaintiff's contention that the defendant was negligent in moving the cars and gangplank, and that his injuries resulted solely from such carelessness on the part of the defendant.

[1, 2] The cattle yards and gangways in question were the property of the defendant, and therefore, if plaintiff was lawfully at the place of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the accident, the defendant was in duty bound to so conduct its operations as not to inflict injury upon plaintiff. Of course, if the plaintiff was a trespasser upon defendant's property when he received his injuries, the defendant cannot be held liable therefor, except it appear that such injuries were the result of some wanton or intentional act of defendant.

[3] There was a sharp conflict upon the trial as to just what plaintiff's position was at the time he was injured—whether, as claimed by him, he was lawfully upon the chute at the implied invitation of defendant, who was charged with the duty of keeping the place in a reasonably safe condition and to operate its cars in a reasonably safe manner, or whether he was a trespasser there, to whom the defendant owed no duty, except to refrain from wanton or intentional act that would harm him.

The jury evidently took the former view. Ordinarily I do not think it proper to interfere with the determination of a jury on questions of fact, if there is evidence upon which their action can be predicated. The jury has the great advantage of contact with the witnesses, whose testimony they hear, and they are best able to determine where the preponderance lies. But in this case I think the facts and surroundings point so inevitably to the falsity of plaintiff's contention, and the verdict of the jury seems to me so palpably against the weight of evidence, that I am constrained to recommend the reversal of judgment herein, and of the order denying defendant's motion for a new trial.

It is a rather peculiar circumstance that, while plaintiff was injured August 24, 1907, he waited over five years before bringing this action—a delay for which no satisfactory excuse is given, and hardly consonant with the positively asserted contention, finally advanced, that defendant was answerable for the injuries which plaintiff sustained.

Upon the trial plaintiff testified that he was then (January 17, 1913) 14 years of age on the 23d of September last; that at the time he was injured he was 9 years old, going on 10. Plaintiff further testified that before the accident he had been employed with other boys by one William R. Smith, a live stock buyer, in driving surplus cattle away from the cattle yards at Antwerp to a pasture three miles away. Plaintiff claims that, shortly before noon on the day in question, he met the shipper, Smith, near the cattle yards, and asked him if he thought there would be any surplus cattle to drive away; that Smith said he did not know, but for plaintiff to hasten back from dinner and he would see; that plaintiff hurried back from his lunch, and met Smith at the yards, and that Smith then separated out six or seven head of cattle, and drove them into the car, and asked plaintiff to watch them, and see that they did not come out. Plaintiff claims he finished driving these cattle into the car, and then stood by the railing, watching the car, when the car was struck by another car, and his foot crushed between the runway and chute.

On cross-examination, plaintiff at first would not testify for sure that there were any cattle in the car when he was hurt, but finally repeated his statement as to the presence of cattle in the car at the time, that he was watching. On cross-examination the plaintiff ad-

mitted that on an occasion about a year after his injury he had a talk with a Mr. Gilligan, defendant's claim agent, and signed a written statement concerning the circumstances under which the accident occurred. This statement appears at page 108a of the record. It was made four years before the bringing of this action, and is quite contradictory in its statements to the testimony of plaintiff, given four years later, when it was perhaps deemed necessary to show his occupation as an employé of the cattle shipper when he was hurt. In this statement he mentions a talk with Smith, and claims to have inquired as to whether there would be cattle to drive, but nowhere mentions his employment to watch cattle in the car. On the contrary, he says he went down to the yards, and that "the men who were to load cattle into the car were at dinner, and I got on the chute to wait for them." In the statement he speaks of other boys playing under the higher chute, and of his warning them of an engine which he saw backing up, and that just as he was about to step up on the fence the car moved and his foot was caught.

This statement cannot be said to have been taken while plaintiff was in distress or suffering. It does not bear the earmarks of fraud, but rather appears to be the sober statement of plaintiff as to what actually occurred, made four years before bringing suit. The plaintiff produced no witnesses corroborating his story of the cattle in the car and of his watch over them. Several of his boy mates were playing about and under the chute, and where they would have known if cattle were in the car at the time; but none were sworn for plaintiff. The plaintiff swore as a witness a farmer named Bellinger, who at about the time plaintiff was injured was engaged in unloading hogs from a wagon 40 feet away, and directly in front of the open car door, and where he could look into the car, and he saw no cattle in the car.

Aside from members of his family, who testified as to his suffering and the medical testimony, plaintiff offered no further evidence. Standing alone, plaintiff's case was at best a weak one when he rested.

The defense first swore Mr. George Smith, who testified that he was at Antwerp on the day in question, and that prior to going to lunch no cattle were placed in the car. William R. Smith, the buyer, was sworn. He testified that no cattle were loaded in the car before lunch. This witness flatly contradicted plaintiff's story that he had told him to stay on the bridge and watch the cattle that were put in the car. Said witness further positively testified that he had put no cattle in the car prior to the plaintiff's injury, and positively denied having said anything to plaintiff upon the subject of watching the car—denied having employed plaintiff for that purpose that day.

One Hicks, a juror serving at Trial Term, testified as to his acquaintance with plaintiff and conversations at the hospital when the witness was a patient, in which plaintiff stated that he was sitting on the cattle yard when a train backed down and hit the chute and injured him, making no reference to his watching cattle in the car at the time. Carl Eagan, a boy four years older than plaintiff, who was playing under the chute when plaintiff was injured, was called by the defendant. While apparently not a willing witness, he testified that he

did not see any cattle loaded in the car prior to the accident, and knew of none being in them, although he had been playing all about the chute and yard most of the forenoon; that, had there been cattle going over the bridge over his head, he would have known it. Aside from some of the train crew, who gave no testimony relating to the matters under discussion, there was no further testimony offered.

It seems clear to me that, considering plaintiff's extremely weak case, so greatly overborne by the testimony of the two Smiths and of the young man, Eagan, all absolutely disinterested witnesses, notwithstanding the labored effort of plaintiff's counsel to make it appear that said witnesses were in some way interested, the jury was led to disregard its duty to render a verdict in accordance with the plain preponderance of evidence, and perhaps through sympathy for an unfortunate youth, who had been injured for life, and feeling that the burden of a money judgment for his benefit would fall lightly upon a wealthy corporation, were prompted to aid him, regardless of legal liability on the part of the defendant.

I think we are compelled to hold that the verdict was against the weight of the evidence, and that the order and judgment appealed from should be reversed, and a new trial ordered, with costs to abide event. I recommend such disposition of the case.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event. All concur.

---

(158 App. Div. 251.)

PEOPLE ex rel. WESTCHESTER ST. R. CO. et al. v. PUBLIC SERVICE COMMISSION FOR SECOND DIST. OF NEW YORK et al.

(Supreme Court, Appellate Division, Third Department. July 8, 1913.)

1. STREET RAILROADS (§ 55*)—MORTGAGES—POWER TO MORTGAGE.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 134; Dec. Dig. § 55.*]

2. CONSTITUTIONAL LAW (§ 93*)—VESTED RIGHTS—MORTGAGES.

Where a street railway company, under Railroad Law (Consol. Laws 1910, c. 49) § 8, subd. 10, authorizing a railroad company so to do, mortgaged its property and franchises, a limitation by a subsequent statute of the right of a railroad company to capitalize its franchises is invalid as to the mortgagee, as it would be an interference with vested property rights under the mortgage.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 176, 177, 181–185, 190–192, 194–200, 208, 213–224, 236; Dec. Dig. § 93.*]

3. STREET RAILROADS (§ 15*)—CAPITAL STOCK.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes